IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| MICHAEL STEPHEN MCCLUNG, ) | CIVIL ACTION NO. 9:16-3658-RMG-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Supplemental Security Income ("SSI") on September 12, 2012 (protective filing date) alleging disability beginning October 31, 2010 due to seizures. (R.pp. 18, 166, 187 ). Plaintiff's claims were denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 24, 2015. (R.pp. 38-89). At the hearing, Plaintiff amended his request to one for a closed period of SSI benefits, from September 12, 2012 (the date he filed his application for SSI) until June 30, 2014.[1] (R.pp. 18, 43).



---

[1]The relevant period for a claimant's SSI claim begins with the application date, through the date of the ALJ's decision. See 20 C.F.R. § 416.202(g) [a claimant is not eligible for SSI until, among other factors, the filing of an application for SSI benefits]; 20 C.F.R. § 416.501 [a claimant may not be paid for SSI for any time period that predates the first month he satisfies the eligibility
(continued...)

The ALJ thereafter denied Plaintiff's claim in a decision issued May 1, 2015. (R.pp. 18-32). The Appeals Council denied Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R.pp.1-5).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed with an award of benefits or alternatively that it be remanded for further consideration. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct**

---

[1](...continued)
requirements, which cannot predate the date on which an application is filed]. As such, Plaintiff's representative acknowledged that SSI benefits could not begin until the date Plaintiff filed his application (R.p. 43). The ending date of June 30, 2014 is based on Plaintiff's earnings (he began working at McDonald's part-time in 2013) which rose to a level of substantial gainful activity in the third and fourth quarters of 2014. (R.pp. 18, 43, 52).



2

**a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Nothing that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

### Medical Records

Plaintiff's medical records show that he has been diagnosed with seizures since approximately April 2006. A brain MRI performed on July 25, 2008 showed "findings suggesting mesial temporal sclerosis[2] on the left." (R.pp. 370-371, 416). After being involved in a motor vehicle accident in August 2010, Plaintiff was admitted to the hospital for seizures and respiratory failure secondary to seizures. (R.p. 440). On October 30, 2010, Plaintiff had a seizure while at work and was taken to the hospital by EMS. (R.pp. 654, 664). A drug screen was positive for cannabinoids. (R.p. 659). Plaintiff was then hospitalized from October 31, 2010 to November 3, 2010, for seizure disorder, acute renal failure, lactic acidosis, and rhabdomyolysis.[3] (R.pp. 654-663).

---

[2]Medial temporal sclerosis, also called hippocampal sclerosis, is a "loss of neurons in the hippocampal region with gliosis sometimes seen with epilepsy." Dorland's Illustrated Medical Dictionary, 1680 (32nd ed. 2012).

[3]Rhabdomyolysis is a "disintegration or dissolution of muscle, associated with excretion of
(continued...)



An EEG on November 5, 2010 revealed abnormal findings for a person of claimant's age. Specifically, it was noted that Plaintiff had interictal expression of an epileptiform discharge over bi-temporal lobes independently, which indicated a predisposition for epilepsy. An independent showing over both hemispheres (left > right) was nonspecific in etiology but suggested a structural or functional lesion. (R.pp. 679-680).

By January 2011, Plaintiff's renal function had returned to normal. Dr. Dinesh Chatoth noted that Plaintiff reported that his seizures began when he was nineteen years old after he started using drugs and alcohol. Dr. Chatoth advised Plaintiff to stop using recreational drugs, to continue taking Keppra and follow up with his neurologist, and to follow up with his primary care physician for complaints of depression. (R.pp. 665-66).

On February 22, 2011, a brain MRI showed "volume loss in the bilateral hippocampi with abnormal bright T2 signal most consistent with bilateral mesial temporal sclerosis." (R.p. 676).

In July 2012, Plaintiff underwent neuropsychological testing by Dr. C. Richelle Fitzsimmons, a psychologist at Peace Rehabilitation Hospital (PRH). This testing revealed:

> Severe memory impairments in both the verbal and visual context. Specific measures with a high sensitivity to brain damages were also decreased for [Plaintiff] (i.e. verbal fluency measure, processing speed tasks). These deficits are in the context of a very strange neuropsychological profile characterized by average to well above average performance across domains of attention, language, visuospatial skills and executive function. Intelligence and achievement testing indicate high average to superior abilities. Time pressured tasks proved to be a relative weakness for [Plaintiff] and this information would be helpful to keep in mind during job selection.

(R.p. 338).

---

[3](...continued)
myoglobin in the urine." <u>Dorland's Illustrated Medical Dictionary</u> at 1637.


An EEG on November 5, 2010 revealed abnormal findings for a person of claimant's age. Specifically, it was noted that Plaintiff had interictal expression of an epileptiform discharge over bi-temporal lobes independently, which indicated a predisposition for epilepsy. An independent showing over both hemispheres (left > right) was nonspecific in etiology but suggested a structural or functional lesion. (R.pp. 679-680).

By January 2011, Plaintiff's renal function had returned to normal. Dr. Dinesh Chatoth noted that Plaintiff reported that his seizures began when he was nineteen years old after he started using drugs and alcohol. Dr. Chatoth advised Plaintiff to stop using recreational drugs, to continue taking Keppra and follow up with his neurologist, and to follow up with his primary care physician for complaints of depression. (R.pp. 665-66).

On February 22, 2011, a brain MRI showed "volume loss in the bilateral hippocampi with abnormal bright T2 signal most consistent with bilateral mesial temporal sclerosis." (R.p. 676).

In July 2012, Plaintiff underwent neuropsychological testing by Dr. C. Richelle Fitzsimmons, a psychologist at Peace Rehabilitation Hospital (PRH). This testing revealed:

> Severe memory impairments in both the verbal and visual context. Specific measures with a high sensitivity to brain damages were also decreased for [Plaintiff] (i.e. verbal fluency measure, processing speed tasks). These deficits are in the context of a very strange neuropsychological profile characterized by average to well above average performance across domains of attention, language, visuospatial skills and executive function. Intelligence and achievement testing indicate high average to superior abilities. Time pressured tasks proved to be a relative weakness for [Plaintiff] and this information would be helpful to keep in mind during job selection.

(R.p. 338).

---

[3](...continued)
myoglobin in the urine." <u>Dorland's Illustrated Medical Dictionary</u> at 1637.



Plaintiff began a rehabilitation program at PRH on August 3, 2012, and Dr. Fitzsimmons noted that Plaintiff presented with severe memory deficits and ongoing depressive symptoms. (R.p. 356). On August 14, 2012, case manager Lorraine Greene of PRH Outpatient Brain Injury Program and Dr. John McBurney signed a Team Treatment Plan Summary for Plaintiff that identified Plaintiff's deficits as functional memory, awareness of deficits, limited social support, and select aspects of emotional health. It was thought that these deficits limited Plaintiff's functional life in the areas of independent living, academic re-entry, work re-entry, community integration, coping skills, and leisure. The plan was for occupational therapy, physical therapy, speech therapy, and psychologic treatment. (R.pp. 303-304).

On September 12, 2012, Plaintiff began treatment with neurologist Dr. McBurney (at Greenville Hospital System University Medical Group). It was noted that Plaintiff had been seizure free for two years, since October 2010. Plaintiff reported that his main issue was persistent memory disturbance; specifically, that his procedural memory and remote memory were intact, but the learning of new information was impaired. Dr. McBurney reviewed neuropsychological testing and noted that it indicated profound amnestic syndrome. His impression was that the findings suggested mesial temporal sclerosis on the left. (R.pp. 365-366). On January 2, 2013, Plaintiff reported to Dr. McBurney that he had had no seizures since his last visit and felt better since starting Aricept. (R.p. 374).

On January 18, 2013, state agency psychologist Dr. Martha Durham completed a psychiatric review technique form and a mental RFC assessment in which she opined that Plaintiff had mild limitations in his activities of daily living and social functioning; moderate limitations in concentration persistence or pace; and no episodes of decompensation. She further opined that



5

Plaintiff was able to understand, remember, and carry out short and simple instructions; maintain concentration and attention for at least two hours; perform in situations that required ongoing interaction with the public; and was able to be aware of normal hazards and take appropriate precautions. Dr. Durham thought that while Plaintiff had some memory deficits following a seizure, he had good social skills and good functioning including the ability to drive, perform chores, cook, manage money, and care for his pets. She opined that Plaintiff's impairments did not preclude the performance of simple, repetitive work tasks in a setting that required ongoing interaction with the public. (R.pp. 95-96, 99-100).

A report dated January 20, 2013 indicates that EMS had been called because Plaintiff was thought to be intoxicated at a bar. During the call Plaintiff became belligerent with police and was placed in a police car. (R.pp. 580-581).

On January 23, 2013, state agency physician Dr. Ted Roper opined that Plaintiff had the ability to perform medium work, but could never climb ladders, ropes, or scaffolds. He also opined that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but needed to avoid even moderate exposure to hazards such as machinery and heights. (R.pp. 97-99).

On January 28, 2013, Plaintiff reported to Dr. McBurney that he had had a seizure at a beer tasting, was unsure how much he had to drink, and had been taken to jail. Dr. McBurney assessed seizure and anoxic-ischemic encephalpathy and continued Plaintiff's Keppra and Donepezil Hydrochloride medication for these conditions. (R.pp. 376-377).

Records from Greenville Health System from February, March, and April 2013 indicate that Plaintiff had dislocated his right shoulder on numerous occasions due to seizures.



(R.pp. 388-397). On February 13, 2013, an x-ray of Plaintiff's shoulder showed "clear anterior dislocation with no evidence of fracture." (R.p. 396). On March 1, 2013, Dr. Stefan J. Tolan noted that Plaintiff had a right shoulder dislocation about six months before, had a second dislocation, and "has had two other dislocations, the last one while he was asleep without any trauma." (R.p. 392). On April 4, 2013, Plaintiff underwent right shoulder arthroscopy with anterior capsulorrhaphy/Bankart repair and arthroscopic Remplissage rotator cuff repair. (R.p. 649). In a follow-up examination on April 24, 2013, Dr. Sarah Carter noted Plaintiff's shoulder surgery, that he had had no seizures since his last visit, and reported that his depression was well controlled on Cymbalta. (R.pp. 720-721).

On July 9, 2013, Plaintiff was examined by Dr. Kent Kistler, a neurologist, at the request of the state agency. Dr. Kistler noted that Plaintiff was cooperative and oriented with normal insight and judgment; was able to give a lucid history without confusion; had normal grip strength and dexterity; had normal sensation; normal to above average vocabulary; and normal syntax. Dr. Kistler thought that Plaintiff's history suggested an underlying etiology for seizures with incomplete control in the past, but because his seizures were currently controlled, Plaintiff would be able to function in a work environment. He noted that Plaintiff's cognitive complaints were unexplained by his seizure history, but based on previous testing Plaintiff would be limited as to any employment requiring recall or cognitive challenges to his immediate memory. Dr. Kistler also thought that Plaintiff might be a candidate for vocational assessment and training. (R.pp. 405-407).

On July 16, 2013, Plaintiff was examined by Dr. David Price, a psychologist, at the request of the state agency. Dr. Price noted that Plaintiff ambulated normally; had no motor abnormalities; had normal speech and language; had normal thought content and thought processes;



7

had a normal affect with appropriate range; had an appropriate emotional state; related satisfactorily; had adequate concentration and attention; had full range of affect; was not distractible; was oriented to person, place, date and situation; could recall five words immediately, but no words after five minutes with interference; could perform serial sevens; spelled world correctly forward and in reverse; and could recall six digits forward and backwards. Dr. Price thought that Plaintiff could think abstractly, follow instruction, relate to others, and handle his own funds. Plaintiff reported to Dr. Price that he could dress himself; make coffee; order food at a restaurant; read, write, add, subtract, multiply, and divide; operate a calculator; type 50 words per minute; use text messaging; drive; keep appointments; supervise or direct others; manage a checkbook; look up words in a dictionary; wash a car; manage a Facebook page; tend to a garden; mow the lawn; wash dishes; do laundry; cook; take out the trash; shop in stores; manage money; use a paintbrush, wirecutters, and a stapler; read rules and gauges; and feed and care for pets. Dr. Price opined that Plaintiff had no impairment in his activities of daily living and no impairment in social functioning; that he might have a moderate impairment in concentration, persistence, or pace related to his brain injury; had adequate mental control; and would be able to compensate for any slight memory impairment. He concluded that Plaintiff was capable of performing some type of substantial gainful activity. (R.pp. 409-413).

On August 8, 2013, state agency psychologist Dr. Xanthia Harkness affirmed Dr. Durham's opinion. She noted that the new records submitted on reconsideration indicated that Plaintiff could drive his car independently, use a smart phone, read, write, do math, type 50 words per minute, manage a checkbook, wash his car, clean, manage Facebook, and perform yard work. Dr. Harkness opined that Plaintiff's mental impairments would not preclude the ability to perform



8

simple, unskilled tasks. (R.pp. 113-114, 117-118). State agency physician Dr. Carl Anderson opined on August 26, 2013 that Plaintiff had no exertional limitations; could never climb ladders, ropes, or scaffolds; was limited to frequent crawling and frequent overhead reaching with his right upper extremity; and must avoid all exposure to hazards such as machinery and heights. (R.pp. 115-117).

On November 30, 2013, Plaintiff was in a motor vehicle accident (his car went off the road and hit a chain link fence). He was taken by ambulance to Greenville Memorial Hospital, at which time he was diagnosed with a seizure. (R.pp. 574-575, 639-644). On February 24, 2014, Plaintiff was taken by ambulance from his workplace to the Greenville Memorial Hospital, at which time he was diagnosed with a seizure. (R.pp. 631-638). EMS personnel noted that Plaintiff was sitting on the sidewalk being held upright by a police officer and was alert, but confused. (R.p. 567).

On March 19, 2014, Plaintiff reported to Dr. McBurney that he had had two seizures (in November 2013 and February 2014) since his last visit in August 2013. Dr. McBurney wrote:

> In summary patient has a history of intractable seizures with persistent cognitive deficits following prolonged status epilepticus. In addition he is significantly depressed. Treatment options including addition of a second agent and vagal nerve stimulator have been discussed.

(R.pp. 589-590).

On March 27, 2014, Plaintiff called his mother and complained of a headache. He began having some unusual behaviors, an ambulance was dispatched to his workplace as a result of a report that he had a seizure, and EMS staff found him unresponsive and face-down in a booth. (R.pp. 560-561). Plaintiff was admitted to Greenville Memorial Hospital from March 27 to 30, 2014, for having "4 to 5 generalized tonic-clonic seizures in one afternoon without return to baseline." Plaintiff reported that he last drank alcohol in October 2010 or 2011, and that he stopped drinking



9

alcohol because it seemed to trigger seizures. He reported that he smoked marijuana about two times a day and had last done so two days prior to his admission to the hospital. Plaintiff's discharge diagnoses included seizure; depression, major; and tobacco abuse. (R.pp. 598-608).

On June 25, 2014, Plaintiff reported to Dr. McBurney that he was very compliant with his medications and had not had a seizure in three and one-half months, but he was still very depressed and was frustrated with his life working at McDonald's despite having almost two college degrees. Dr. McBurney noted that Plaintiff was intermittently tearful and seemed quite depressed. Dilantin, Keppra, Vimpat, and Depakote were prescribed, and Plaintiff was referred for evaluation and treatment at PRH. (R.pp. 586-587).

Plaintiff was evaluated by Dr. Tracie Mertz McConnell at the PRH on August 15, 2014. Plaintiff reported that he was concerned that his prescribed Dilantin resulted in his being angry and having a labile mood. Dr. McConnell noted that Plaintiff had depression secondary to seizures limiting his lifestyle; fleeting suicidal ideations with no intent; and a sad, anxious, restricted mood and affect. The plan was for Plaintiff to return for subsequent counseling sessions. (R.p. 736). Plaintiff underwent implantation of a vagal nerve stimulator on November 14, 2014. (R.pp. 595-596).

On March 12, 2015, Dr. McConnell completed a neuropsychological evaluation indicating that Plaintiff had been seen for testing on February 2, 2015. She noted that Plaintiff had not had a seizure in approximately a year. Dr. McConnell diagnosed Plaintiff with cognitive disorder NOS secondary to epilepsy and depression; depression; memory loss; organic brain syndrome, non-psychotic; epilepsy; and attention deficit disorder. Prior testing revealed impairments in auditory/verbal and visual/spatial memory; that his working memory ranged from high average to



10

mildly impaired, and that his primary problem was poor retention of information. Dr. McConnell thought that Plaintiff's low average processing speed, which showed a decline from average levels at a 2012 evaluation, was a relative weakness. She recommended that Plaintiff's physician consider adjusting his memory medication and antidepressant; that Plaintiff continue psychotherapy, and that Plaintiff be referred to PRH for speech therapy and occupational therapy to address his memory and processing speed problems. Dr. McConnell thought that Plaintiff's learning/remembering new skills was derailed by a moderate to severe memory impairment, that his decline in processing speed might further hamper his ability to work at an efficient pace, and that consideration needed to be given to the impact Plaintiff's limited mental endurance had on sustaining an adequate level of performance. She recommended that Plaintiff be referred to Vocational Rehabilitation to assist him in finding appropriate employment with accommodations for memory impairment. (R.pp. 737-741).

## **Discussion**

Plaintiff was twenty-six years old on the date his application was filed. He has more than a high school education (he reports he has a college degree), but no relevant past work experience. (R.pp. 30, 49, 166, 188). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months.



11

After a review of the evidence and testimony in the case, the ALJ determined that although Plaintiff does suffer from the "severe" impairments[4] of epilepsy, organic brain syndrome, anxiety disorder, affective disorder, and dysfunction of his right shoulder (R.p. 20), he nevertheless retained the residual functional capacity (RFC) for a full range of work at all exertional levels, with the limitations that Plaintiff can never climb ladders, ropes, and scaffolds; can frequently crawl; can frequently reach overhead with his right upper extremity; cannot work with moving machinery nor have exposure to unprotected heights; and can perform simple, routine, repetitive tasks, performed in a work environment free of fast-paced production requirements, involving simple work-related decisions and few, if any, workplace changes. (R.p. 24). The ALJ then obtained testimony from a vocational expert (VE) and found at step five that Plaintiff could perform jobs existing in significant numbers in the national economy with these limitations, and that he was therefore not entitled to disability benefits during the time period at issue. (R.pp. 31-32).

Plaintiff asserts that in reaching this decision the ALJ erred because he failed to recontact Plaintiff's treating medical provider as required by 20 C.F.R. § 404.1512, and failed to consider the various factors set forth in 20 C.F.R. § 404.1527 in evaluating the opinion of his treating physician.[5] Specifically, Plaintiff alleges that the ALJ failed to properly consider the opinion of his

---

[4] An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[5] Plaintiff also asserts that the ALJ failed to take into account that the VE, in response to questioning from Plaintiff's attorney, stated that Plaintiff's work as a cashier at McDonald's was sheltered work. (R.pp. 84-85). However, Plaintiff concedes that his work at McDonald's rose to the level of substantial gainful employment as of the end of June 2014. (R.pp. 42-43). Further, in response to the ALJ's hypothetical, the VE found that a person of Plaintiff's RFC could perform the jobs of hand packer, night cleaner, and general laborer (the job of cashier was not one of the jobs
(continued...)



12

treating physician, Dr. McBurney, by failing to properly consider the factors set forth in 20 C.F.R. § 404.1527, failing to consider the nature of the physician/patient relationship between Plaintiff and Dr. McBurney, and improperly favoring the opinions of three state agency evaluators who never even met the Plaintiff. After careful review of the record and consideration of the arguments presented, the undersigned is constrained to agree with the Plaintiff that this case should be reversed and remanded because the ALJ failed to properly evaluate the opinions of Plaintiff's treating neurologist.

On October 29, 2012, Dr. McBurney completed a form for Cigna Healthcare in which he stated that he saw Plaintiff once, on September 12, 2012, but that Plaintiff had previously been seen by a neurologist in his group since 2008 every six to twelve months. Dr. McBurney opined that Plaintiff had a severe impairment, was incapable of self-sustaining employment due to a physical or mental handicap since 2006, and would probably never be capable of self-sustaining employment. He further thought it was uncertain whether Plaintiff was trainable/educable and noted that Plaintiff had been referred to a cognitive rehabilitation program which included vocational assessment. (R.pp. 502-503). Thereafter, on January 28, 2013, Dr. McBurney wrote a letter stating that Plaintiff was under his care:

> for epilepsy and severe memory impairments after a lack of blood and oxygen delivery to the brain. He had an episode on 1-20-13 at a public event most consistent with a complex partial seizure. This was followed by a post-ictal delirium. In my opinion [Plaintiff] was not competent or able to conform his behavior to apparently acceptable standards due to his medical conditions.

(R.p. 501).

---

[5](...continued)
identified by the VE at the hearing or by the ALJ in his decision); (R.pp. 82-83); although the job of cashier (of which there were approximately 3,000,300 jobs available nationally) would be reduced by 90 percent (i.e., that it would be reduced to approximately 30,000 jobs) based on the way Plaintiff was performing his cashier job. (R.p. 86).



The ALJ stated that he gave "little weight" to Dr. McBurney's October 2012 opinion, stating that it was vague, not supported by the medical evidence of record, and was (as to the statement of an inability to work) an issue reserved to the Commissioner. The ALJ stated that he also gave little weight to Dr. McBurney's January 2013 limitation, as it was vague and did not indicate Plaintiff's ability to function on a day-to-day basis. (R.p. 29).

A treating physician's opinion is ordinarily entitled to great weight; see Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996)[Noting importance of treating physician opinion]; is entitled to deference, and must be weighed using all of the factors provided for in 20 C.F.R. §§ 404.1527, 416.927. See SSR 96-2p.[6] Under these regulations, a treating source's opinion on the nature and severity of an impairment is entitled to "controlling weight" where it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. Further, the ALJ is required to provide an explanation in the decision for what weight is given a treating source's opinion and, if rejected, why it was rejected. See 20 C.F.R. §§ 404.1527(c), 416.927(c). Specifically, the Regulations provide that, if a treating source's opinion is not accorded controlling weight, the ALJ is required to consider "all of the following factors in deciding the weight we give to any medical opinion": (1) examining relationship ("[g]enerally, we give more weight to the opinion of a source who has examined you than the opinion of a source who has not examined you"); (2) treatment relationship, including length of

---

[6]The undersigned notes that for claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 416.920c. However, the claim in the present case was filed before March 27, 2017, and Plaintiff's claim has therefore been analyzed pursuant to the treating physician rule set out above.

14



treatment relationship, frequency of examination, and the nature and extent of the treatment relationship; (3) supportability ("[t]he more a medical source presents relevant evidence to support an opinion ... the more weight we will give that opinion"); (4) consistency; (5) specialization; and (6) other factors. 20 C.F.R. § 416.927(c).

However, in reviewing an ALJ's decision it should be noted that "the Fourth Circuit has not mandated an express discussion of each factor and another court in this district has held that 'an express discussion of each factor is not required as long as the ALJ demonstrates that he applied the ... factors and provides good reasons for his decision.'" Kirby v. Colvin, No. 4:13-cv-3138-DCN, 2015 WL 1038036, at *3 (D.S.C. Mar. 10, 2015) (quoting Hendrix v. Astrue, No. 1:09-cv-1283, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010)); see 20 C.F.R. § 416.927(c)(2) [requiring ALJ to give "good reasons" for weight given to treating source's opinion]; see also Ware v. Astrue, No. 5:11-CV-446-D, 2012 WL 6645000, at *2 (E.D.N.C. Dec. 20, 2012) [noting that the ALJ need not discuss all the factors, but "must give 'good reasons' for the weight assigned to a treating source's opinion."](citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), and SSR 96–2p, 1996 WL 374188, at *5). Further, it is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." Craft v. Apfel, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

In this case, however, it is unclear from the ALJ's decision whether he applied the factors from § 416.927 at all. Indeed, there is no indication that the ALJ even made a determination as to whether Dr. McBurney was a treating physician. While it is true that Dr. McBurney had only



15

examined the Plaintiff on one occasion (in September 2012) and signed a treatment plan (in August 2012) at the time he gave his October 2012 opinion, it is clear from the numerous later treatment notes in the record that Dr. McBurney was a treating physician for purposes of Plaintiff's application. Moreover, although the ALJ, earlier in his decision, recited various treatment records from Dr. McBurney, there is no discussion or acknowledgment that Dr. McBurney is a specialist (the ALJ does not even note that Dr. McBurney is a neurologist), which would have entitled his opinion to even more weight. See 20 C.F.R. § 404.1527 [opinion of a specialist about medical issues related to his or her area of specialty generally entitled to more weight than the opinion of a physician who is not a specialist]. Additionally, although the ALJ dismissed Dr. McBurney's October 2012 opinion as not being supported by the medical evidence, he provides no discussion or reason for this finding, and he dismissed Dr. McBurney's opinion of January 2013 as being "vague" even though Dr. McBurney cites to some specific medical events as support for why he did not believe Plaintiff to be competent at that time.

In contesting the ALJ's finding, Plaintiff argues that support for Dr. McBurney's opinions can be found in the records from Dr. Fitzsimmons and counselor Carrie S. Anderson, which indicate that testing in July 2012 showed that Plaintiff had moderate to severe memory impairments in both the verbal and visual context (R.pp. 329, 338); treatment notes from Dr. Fitzsimmons in August and October 2012 indicating that Plaintiff had severe memory deficits (R.pp. 355, 356); and Dr. Price's July 2013 testing indicating that Plaintiff could recall zero of five words after five-minutes with interference (R.p. 409). Consultative neurologist Dr. Kistler also suggested that Plaintiff's memory would limit his ability to work, noting that previous testing suggested that Plaintiff "would be limited in employment requiring recall or cognitive challenges [that] depend on his immediate



16

memory." (R.p. 407). While there is also medical evidence in the record which could be cited as support for the ALJ's ultimate conclusions, it is incumbent on the ALJ to discuss the competing evidence to show why his findings are supported by substantial evidence. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) ["What we require is that the ALJ sufficiently articulate her assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"]. He cannot simply disregard or discredit a treating physician's opinion by making a general statement that it "is not supported by the medical evidence of record" and leave it at that. Morales v. Apfel, 225 F.3d 310, 317-318 (3d Cir. 2000) [ALJ must explicitly weigh the evidence and explain his rejection of the medical opinion of a treating physician].

In arguing for an affirmance of the decision, the Commissioner asserts that the ALJ correctly discounted Dr. McBurney's opinions because the 2012 opinion is on a checkbox/fill-in-the-blank form that is devoid of any substantive explanation to support Dr. McBurney's assertion that Plaintiff was unable to work. The Commissioner also identifies certain medical records that she asserts do not support Dr. McBurney's opinion, argues that Plaintiff's activities of daily living (including that Plaintiff started to work part-time in 2013) are inconsistent with Dr. McBurney's opinions, appears to argue that Dr. McBurney's January 2013 statement merely applies to Plaintiff's behavior at the beer tasting (in the context of Plaintiff's intoxication, possible seizure resulting therefrom, and ultimate arrest), and points to evidence in the record that allegedly does not support the January 2013 statement. However, these arguments are only post hoc rationalization for upholding the decision, since (as previously noted) that is not what the ALJ discussed or found in his decision. See Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990) ["Implicit" rejection of treating physician's opinion cannot satisfy Administration's obligation to set forth "specific, legitimate



17

reasons" for rejecting a treating physician's opinion]; see also Ellis v. Astrue, No. 07–3996, 2009 WL 578539, at * 8 (D.S.C. Mar. 5, 2009) [Rejecting post hoc rationale for ALJ's decision]. While the ALJ may in fact believe that Plaintiff's memory and other impairments were not significant enough to effect his ability to perform the range of work identified, it was incumbent on the ALJ to make that specific finding and explain how the evidence relating to Plaintiff's limitations did or did not effect his ability to perform the range of work identified. His failure to do so requires a remand for a proper consideration of these issues. Nester v. Astrue, No. 08–2045, 2009 WL 349701, at * 2 (E.D. Feb. 12, 2009) [Noting that the Court "may not consider post hoc rationalizations but must evaluate only the reasons and conclusions offered by the ALJ."].

Therefore, the decision should be reversed and remanded for consideration of all of the evidence and opinions of Dr. McBurney. With respect to the remainder of Plaintiff's claims of error,[7] the ALJ will be able to reconsider and re-evaluate the evidence in toto as part of the reconsideration of this claim. Hancock v. Barnhart, 206 F.Supp.2d 757, 763-764 (W.D.Va. 2002)[On remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted *de novo*].

---

[7]Plaintiff also argues that the ALJ "must" recontact his treating physician pursuant to 20 C.F.R. § 404.1512(e) and 416.912(e) which provided that the SSA would recontact a medical source in specified circumstances. However, in 2012, 20 C.F.R. § 404.1512(e) was eliminated. The revised regulations, which were in effect at the time of the ALJ's decision, provide that an ALJ "may" contact a treating source if the evidence is consistent, but there is insufficient evidence to determine whether the claimant is disabled, or if after weighing the evidence, the ALJ cannot reach a conclusion about whether the claimant is disabled. 20 C.F.R. § 416.920b(c) (2012). Further guidance as to whether to recontact a treating physician is contained in Social Security Ruling 96-5p, which provides that an ALJ must contact a treating source for clarification on issues reserved to the Commissioner when "the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record...." SSR 96-5p. The ALJ can evaluate this issue upon remand of the case.



18

**Conclusion**

Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence Four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for proper consideration of the opinions of treating neurologist Dr. McBurney, and for such further administrative action as may be necessary and appropriate. See Shalala v. Schaefer, 509 U.S. 292 (1993).

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

November 16, 2017
Charleston, South Carolina



### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).